UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

ATICO INTERNATIONAL USA, INC., a
Delaware corporation,

             Plaintiff,

v.

LUV N' CARE, LTD., a Louisiana corporation,
and ADMAR INTERNATIONAL, INC., a
Delaware corporation,

             Defendants.

CASE NO.: 09-60397-CIV-COHN/SELTZER

## AMENDED COMPLAINT

Plaintiff ATICO International USA, Inc. (Atico) amends its Complaint seeking

declaratory judgments against defendants Luv N' Care, Ltd. and Admar International, Inc.

(collectively, "defendants") as follows:

## PARTIES

1.    Atico is a Delaware corporation having a principal place of business at 501 South

Andrews Avenue in Fort Lauderdale, Florida.

2.    Defendant Luv N' Care, Ltd. is a Louisiana corporation having a principal place of

business at 3030 Aurora Avenue in Monroe, Louisiana.

3.    Defendant Admar International, Inc. (Admar) is a Delaware corporation having a

principal place of business at 3030 Aurora Avenue in Monroe, Louisiana.

## JURISDICTION AND VENUE

4.    Atico brings this action under 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202 for

declaratory judgment based on United States trademark law, including Section 43 of the Lanham

Act (15 U.S.C. § 1125) and Florida state law, including unfair competition and unfair and deceptive trade practices laws.

5.   Defendants sued Atico's customer Walgreens in the United States District Court for the Southern District of New York, Civil Action No. 08-4457 ("the New York suit"), alleging infringement of alleged unregistered trade dress and violations of state law based on those claims.  A true and correct copy of the Complaint and Exhibits from the New York suit is attached as Exhibit A to DE 1 (incorporated here as "Ex. A").

6.   Defendants contend Atico is the "real party in interest" in the New York suit.

7.   Defendant Luv N' Care holds itself out as "one of the leading baby product companies in the world today.  It enjoys a widespread reputation throughout the United States…as a result of the popular products that it has …commercialized in interstate…commerce for use by babies and young children."  Ex. A at ¶ 9.  It is subject to personal jurisdiction in Florida.

8.   On information and belief, defendant Admar does not design, manufacture, market, promote, or commercialize products.

9.   On information and belief, defendant Admar "is the owner of United States Trademark Registration No. 2,335,700 for the trademark NUBY®" that defendant Luv N' Care uses to sell the interstate-commercialized products described in Paragraph 9.  Ex. A at ¶¶ 10-12.

10.   On April 30, 2009, defendant Admar's Counsel wrote "Admar's [corporate] deposition [in the New York suit], since it is merely the owner of the trademark NUBY, cannot take 30 minutes."

11.   Defendant Admar is not the owner of any intellectual property rights asserted in the New York suit.

12.   In the New York suit, both defendants claim to have designed, promoted and commercialized products, including the products at suit in this Complaint and the New York suit, throughout the United States.  *E.g.* Ex. A at ¶¶ 14-18.  They necessarily must have done so in Florida, directing their accused conduct into this forum, seeking Floridians as customers, and availing themselves of Florida law.

13.   Since this conduct includes the use of unregistered trade dress that defendants improperly assert as intellectual property against residents of this and other jurisdictions, they have also committed specific torts within Florida.  Specifically, they have at least improperly claimed trade dress protection throughout the United States and by abusing process in other states that affects the rights of Florida residents.

14.   This Court has specific and general personal jurisdiction over defendants, including under Florida's long arm statute, F.S. 48.193.

15.   The amount in controversy exceeds $75,000.00.

16.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332, 1338(a), 2201 and 2202 for declaratory judgment based on United States trademark law, including Section 43 of the Lanham Act (15 U.S.C. § 1125).

17.   This Court has jurisdiction over the claims based on state law under 28 U.S.C. § 1367.

18.   Venue is proper in this district under 28 U.S.C. §§ 1391(a) and (b).

## FACTUAL BACKGROUND

19.   Atico sells, offers for sale and distributes high-quality, popular products for use by babies and young children and their parents.  These products include at least two of the products accused in the New York suit (see Ex. A at ¶¶ 38-49).

20.   Both of those products may be generically referred to as "sippy cups."

21.   Atico supplies Walgreens with the accused products from the New York suit.

22.   Atico's products compete with defendants' products.

23.   Atico is Walgreens' second largest supplier of baby products.

24.   Walgreens purchases sippy cups from Atico's competitors, including Gerber, Playtex and Avent, just not plaintiff Luv N' Care's sippy cups.

25.   Walgreens chose Atico's competing products because they offer consumers better value than other products available on the market and believes Atico's products to be at least as good as competing products.

26.   Walgreens believes its privately-branded products to be of at least comparable quality to nationally-branded, similar products.

27.   Atico's competing products that Walgreens sells offer consumers better value than defendants' competing products.

28.   On information and belief, Atico's competing products are also of superior quality to other products available on the market, including defendants' products.

29.   For example, a teething child will quickly cause defendants' asserted products to leak, while Atico's products do not suffer such commercial defects.

30.   Prudent business practices include selecting products of superior quality that offer consumers better value for selling on shelves at retail.

31.   This is especially true for retail sales of semi-disposable items like products for children.

32.   Walgreens conducts prudent business practices.

33.   Walgreens' sales of Atico's products have been more successful than its attempts to sell defendants' products.

34.   Walgreens attributes this success to at least the better consumer value associated with Atico's products that look different from defendants' products.

35.   That is, Walgreens made a successful, prudent business decision by buying products from Atico.

36.   Atico's competing products also look different from defendants' competing products.

37.   Other competing products, like Munchkin, Babies R' Us, Gerber, Playtex and Avent, look different from defendants' asserted trade dress even if they may have certain similar functional features.

38.   On information and belief, defendants mark their asserted products in the New York suit with U.S. or foreign patent numbers.

39.   On July 18, 2006, defendants sent a letter to Walgreens alleging that their asserted products are covered by one or more U.S. or foreign patents.  Ex. A at Ex. F (July 18, 2006 letter).

40.   Defendants have not filed a patent lawsuit against Atico or Walgreens.

41.   In the July 18, 2006 letter, defendants expressly accused Walgreens of carrying "cheap copies" of defendants' products.

42.   Walgreens does not sell cheap copies.

43.   Since at least as early 2004, defendants have engaged in a campaign of sending letters to business entities in the sippy cup market or submarkets threatening suit for violation of alleged patents and other intellectual property rights.

44. On May 4, 2004 defendants sent such a letter to Regent Babies Products Corp.

45. On May 5, 2004 defendants sent such a letter to Royal King Infants Products Co. Ltd.

46. On October 11, 2007 defendants sent such a letter to The Walt Disney Company.

47. On November 2, 2007 defendants sent such a letter to Fisher-Price, Inc.

48. On November 8, 2007 defendants sent such a letter to Dollar King Corp.

49. On information and belief, defendants know that when they sent their July 18, 2006 letter that they had no legitimate basis to assert patent infringement or other claims.

50. Defendants' letter campaign described here is part of an improper attempt to use inapplicable and nonexistent intellectual property rights in an attempt to monopolize the relevant sippy cup market or relevant submarkets for sippy cups.

51. Defendants sued Walgreens in the New York suit because they were unhappy with Walgreens' and Atico's successful and proper competition.

52. Defendants sued Walgreens in the New York suit because they are unable to compete with Atico's products that have superior quality and better consumer value.

53. Defendants did not assert patent rights in the New York suit.

54. Defendants did not assert any registered trademark in the New York suit against Atico.

55. On information and belief, defendants do not sell any of the same products that Atico sells.

56. In the New York suit, defendants claim defendant Walgreens sells a "cheap knockoff" of defendants' products acquired from a company in Thailand. Ex. A at ¶ 22.

57. Walgreens does not sell cheap knockoffs.

58.   Rather, Atico's products are superior in quality and a better value than defendants' asserted products.

59.   On information and belief, defendants knew that Atico supplied Walgreens with the products accused in the New York suit.

60.   In the New York suit, defendants claim their products and designs are entitled to unregistered trade dress protection, that their trade dress has acquired secondary meaning, that Atico' products are confusing consumers as to their source, that defendants' trade dress is being diluted and tarnished, that Atico is willfully infringing the improperly asserted and nonexistent trade dress, and that Atico's customers have engaged in Federal unfair competition and violated state laws regarding unfair competition.  Ex. A at ¶¶ 17-18, 62-66, 75-94.

61.   On information and belief, defendants have no Federally-registered trade dress. See <www.uspto.gov> (visited March 10, 2009).

62.   The alleged trade dress asserted in the New York suit is unregistered.

63.   Defendants' alleged trade dress has not acquired secondary meaning.

64.   Defendants cite no evidence in their Complaint in the New York suit that their unregistered trade dress has acquired secondary meaning.

65.   Other market participants besides Walgreens and Atico have sold competing products so similar to defendants' that the average consumer would not know the source of any particular product that competes with defendants' products.

66.   In the New York suit, defendants do not plead their products are non-functional. See generally Ex. A.

67. Supreme Court precedent, and the Congress, require a plaintiff claiming trade dress infringement to demonstrate the alleged trade dress is non-functional. *See, e.g.*, *Traffix Devices, Inc. v. Marketing Displays, Inc.* 532 U.S. 23, 28-29 (2001); 15 U.S.C. §§ 1125(a)(3) and (c)(4).

68. In the New York suit, Defendants pled allegations describing their products with functional language. See, *e.g.*, Ex. A at ¶¶ 31, 40, 45, 50, 54.

69. On information and belief, defendants have marked their asserted products in the New York suit with U.S. or foreign patent numbers.

70. On information and belief, defendants know their alleged trade dress to be functional.

71. Each Exhibit attached to Ex. A has functional components.

72. Defendants do not have protectable trade dress in their products or designs.

73. Defendants intentionally filed a Complaint in New York improperly asserting that their products or designs are protected trade dress.

74. On information and belief, defendants filed the New York suit intending that it would damage the business relationship between Walgreens and Atico.

75. On information and belief, the New York suit is baseless.

76. Atico's products supplied to Walgreens that are accused in the New York suit do not and cannot infringe any alleged trade dress asserted in the New York suit.

77. Atico is offering and has sold or is selling to Walgreens product designs shown in DE 1 at Exs. A & B.

78. The products identified in paragraph 77 do not and cannot infringe any alleged trade dress asserted by defendants.

79.   Atico is under direct threat of suit. Absent a declaration of nonexistence, invalidity, unenforceability, non-infringement, no confusion, no dilution, no tarnishment, and no Federal unfair competition, Atico will continue to be damaged.

80.   Damage to Atico will continue to accrue unless or until defendants' improper conduct is enjoined.

## COUNT I – (Original Count I) DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF ACCUSED PRODUCTS

81.   Atico incorporates paragraphs 1-42 and 52-80.

82.   An actual and justiciable case and controversy exists between Atico and defendants as to whether Atico's products infringe defendants alleged but unregistered trade dress asserted in defendants' products.  See Ex. A at ¶¶ 34-48, 82-88 & Ex. A at Exs. B & C.

83.   Declaratory judgment should be granted that Atico's products identified in this Count do not infringe any of defendants' alleged but unregistered trade dress.

## COUNT II – DECLARATORY JUDGMENT OF NO TRADE DRESS

84.   Atico incorporates paragraphs 1-42 and 52-80.

85.   Atico has been and continues to be injured and damaged at least by defendants' claiming that Walgreens infringed and infringes nonexistent trade dress asserted by defendants in the New York suit or related to Ex. B to the original Complaint, DE 1.

86.   An actual and justiciable case and controversy exists between Atico and defendants as to whether Atico's products infringe defendants asserted but unregistered trade dress.  See Ex. A at ¶¶ 34-48, 82-88 & Ex. A at Exs. B & C.

87.   Declaratory judgment that no trade dress exists in or on the products that can be asserted against those products at issue in this Amended Complaint.

## COUNT III – DECLARATORY JUDGMENT OF NO SECONDARY MEANING

88.   Atico incorporates paragraphs 1-42, 52-80 and 85-87.

89.   An actual and justiciable case and controversy exists between Atico and defendants as to whether defendants' alleged but unregistered trade dress has acquired secondary meaning.

90.   Declaratory judgment that the alleged but unregistered trade dress of paragraph 89 has not acquired secondary meaning is appropriate.

## COUNT IV – DECLARATORY JUDGMENT OF FUNCTIONALITY

91.   Atico incorporates paragraphs 1-42, 52-80 and 85-87.

92.   An actual and justiciable case and controversy exists between Atico and defendants as to whether defendants' asserted but unregistered trade dress is functional.

93.   An actual and justiciable case and controversy exists between Atico and defendants as to whether defendants' asserted but unregistered trade dress is not "not functional" under applicable trade dress law.

94.   Declaratory judgment is appropriated that the alleged but unregistered trade dress is functional.

95.   Declaratory judgment is appropriate that the alleged but unregistered trade dress is not "not functional" under applicable trade dress law.

## COUNT V – DECLARATORY JUDGMENT OF NO DILUTION

96.   Atico incorporates paragraphs 1-42, 52-80 and 85-87.

97.   In the New York suit, defendants state a cause of action that alleged but unregistered trade dress at issue in that case has been diluted by Atico's products at issue here.

98.   An actual and justiciable case and controversy exists between Atico and defendants as to whether Atico's products dilute defendants' asserted but unregistered trade dress.

99.   Declaratory judgment that no dilution results from Atico's supply of paragraph 99 products to Walgreens or Walgreens' sales of same is appropriate.

## COUNT VI – DECLARATORY JUDGMENT OF NO FEDERAL UNFAIR COMPETITION

100.  Atico incorporates paragraphs 1-42, 52-80 and 85-87.

101.  In the New York suit, defendants state a cause of action that alleged but unregistered trade dress at issue in that case renders Walgreens liable for Federal unfair competition under Section 43(a) of the Lanham Act.

102.  An actual and justiciable case and controversy exists between Atico and defendants as to whether Atico's products dilute defendants' asserted but unregistered trade dress.

103.  Declaratory judgment that no dilution results from Atico's supply of paragraph 103 products to Walgreens or Walgreens' sales of same is appropriate.

## COUNT VII – (Original Count II) TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

104.  Atico incorporate paragraphs 1-80.

105.  Atico and Walgreens have an existing business relationship.

106.  On information and belief, defendants know of the relationship between Atico and Walgreens.

107.  Defendants have intentionally and unjustifiably interfered with the business and economic relationships between Atico and Walgreens.

108.  Atico has suffered damages as a result of defendants' intentional interference with the relationships between Atico and Walgreens.

109.  Defendants' conduct constitutes intentional interference with business relationships. *See Gossard v. Adia Servs.,* 723 So. 2d 182, 185 (Fla. 1998).

110. Damage to Atico will continue to accrue unless or until defendants' improper conduct is enjoined.

### COUNT VIII– (Original Count III) FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FLA. STAT. §§501.201 TO 501.213)

111. Atico incorporate paragraphs 1-80.

112. Defendants' actions constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Florida Statute §501.204.

113. Defendants knew or should have known that their actions were unlawful and would damage Walgreens.

114. Atico has been damaged directly and proximately by defendants' unlawful actions.

115. Atico is entitled to recover actual damages, plus reasonable attorneys' fees and costs for defendants' violation of the Florida Deceptive and Unfair Trade Practices Act.

116. Damage to Atico will continue to accrue unless or until defendants' improper conduct is enjoined.

### JURY DEMAND

117. ATICO requests trial by a jury for all issues so triable.

### PRAYER FOR RELIEF

Atico request the Court enter one or more orders:

A.  Under 15 U.S.C. §1116, enjoining defendants, their agents and employees, and all persons acting in concert with them, from attempting to preclude Atico from importing, making, distributing, using, selling, offering to sell, or marketing of any of the alleged infringing products identified in this Amended Complaint through litigation or other means;

B.  Awarding Atico its costs of suit, including reasonable attorneys' fees, under the Lanham Act and all other applicable laws;

C.  Awarding Atico damages for defendants' deceptive and unfair trade practice, including all costs and fees to Atico associated with defending against asserted but unregistered trade dress;

D.  Awarding Atico damages for defendants' tortious interference with Atico' business relationship, including all costs and fees to Atico associated with defending against defendants' allegations;

E.  Awarding Atico prejudgment interest;

F.  Awarding Atico postjudgment interest;

G.  Requiring defendants to give any applicable postjudgment equitable accounting for the period of damages established at trial;

H.  Declaring defendants' officers vicariously liable for defendants' improper conduct alleged in this Complaint;

I.  Granting such other relief consistent with the requests made in this Complaint; and

J.   Granting such further relief as this Court deems appropriate.

Dated:  May 29, 2009                              Respectfully Submitted,


                                                  s/ Jeffrey H. Kamenetsky
                                                  Jeffrey H. Kamenetsky, Esq.
                                                  jkamenetsky@cwiplaw.com
                                                  Florida Bar No. 044179
                                                  Alan M. Weisberg, Esq.
                                                   Florida Bar Number 479,349
                                                  CHRISTOPHER & WEISBERG, P.A.
                                                   200 East Las Olas Boulevard, Suite 2040
                                                  Fort Lauderdale, Florida 33301
                                                  (954) 828-1488 (Telephone)
                                                  (954) 828-9122 (Facsimile)

                                                  *Attorneys for Atico International USA, Inc.*

154244

# EXHIBIT A

Morris E. Cohen (MC-4620)
Rochelle R. Weisburg (RW-6848)
Law Office of Morris E. Cohen, P.C.
One Penn Plaza, Suite 2527
New York, New York 10119
212-244-4111 x226 (phone)
212-563-7108 (fax)
mcohen@ipcases.com (email)

Of Counsel:
Joe D. Guerriero (Bar No. 06391)
Luv n' care, Ltd.
3030 Aurora Avenue
Monroe, Louisiana 71201
318-338-3603 (phone)
318-388-5892 (fax)
joed@luvncare.com (email)
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LUV N' CARE, LTD. and<br>ADMAR INTERNATIONAL, INC.<br><br>                              Plaintiffs,<br><br>        v.<br><br>WALGREEN CO. and<br>KMART CORP.<br><br>                              Defendants. | CIVIL ACTION NO.<br><br>08 CIV 4457 (DC/HP)<br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiffs Luv n' care, Ltd. and Admar International, Inc. (hereinafter "Plaintiffs") by their

attorneys, hereby complain of Defendant Walgreen Co. ("Walgreen") and Defendant Kmart Corp.

("Kmart") (collectively "Defendants") as follows:

## JURISDICTION AND VENUE

1.  This is an action for federal unfair competition, trademark infringement, and dilution under Section 43 of the Lanham Act, 15 U.S.C. §1125; and for unfair competition, deceptive and unfair business practices under the common law and the law of the State of New York. This Court has jurisdiction over the federal claims of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1338, and 15 U.S.C. 1121, and has jurisdiction over the state claims pursuant to its supplemental jurisdiction under 28 U.S.C. §1367.

2.  This action arises from Defendants' unfair and deceptive business practices, including their offer for sale, sale, and distribution of products which are deceptive copies of Plaintiffs' product designs, product packaging, and trademarks.

3.  This Court has personal jurisdiction over Defendants since Defendants have engaged in acts constituting doing business in this State, and have intentionally directed their tortious activities toward this State, including, sales of the infringing products in this State.

4.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) - (c) and 28 U.S.C. §1400(a).

## THE PARTIES

5.  Plaintiff Luv n' care, Ltd. ("Luv n' care" or "LNC") is a corporation of the State of Louisiana having a principal place of business at 3030 Aurora Avenue, Monroe, Louisiana 71201.

6.  Plaintiff Admar International, Inc. ("Admar") is a corporation of the State of Delaware having a principal place of business at 3030 Aurora Avenue, Monroe, Louisiana 71201. Admar is an affiliate of Luv n' care.

7.  Defendant Walgreen Co. is a corporation of the State of Illinois having a principal place of business at 200 Wilmot Road, Deerfield, IL 60015.

8.     Defendant Kmart Corp. is a corporation of the State of Michigan having a principal place of business at 3100 W. Big Beaver Road, Troy, Michigan 48084.

<u>FACTS</u>

<u>PLAINTIFFS' INTELLECTUAL PROPERTY</u>

9.     Plaintiff Luv n' care is one of the leading baby product companies in the world today. It enjoys a widespread reputation throughout the United States and foreign countries as a result of the popular products that it has designed, introduced, and commercialized in interstate and international commerce for use by babies and young children.

10.     Admar is the owner of United States Trademark Registration No. 2,335,700 for the trademark NUBY®, which was duly and lawfully issued by the United States Patent and Trademark Office on March 28, 2000 ("the '700 registration"). The '700 registration remains in fully good standing and effect.

11.     Luv n' care sells goods under the NUBY® mark throughout the United States under exclusive rights from Admar.

12.     Plaintiffs have used the NUBY® trademark on a wide variety of children's and infants' products sold in interstate commerce, including, but not limited to, children's no-spill drinking cups, baby bottles, infant pacifiers, and so forth. Since commencing use of the NUBY® trademark, Plaintiffs have generated hundreds of millions of dollars in revenue from the sale of goods under their NUBY® mark.

13.     Significant time, funds, and effort were also expended in designing and developing esthetically appealing and attractive product designs and packaging for Plaintiffs' goods.

-3-

14.  Significant sums of money, time, and effort were also expended in promoting and popularizing Plaintiffs' goods.

15.  As a result of Plaintiffs' design efforts and promotional activities, Plaintiffs' products, packaging, and trademarks have all become widely known throughout the United States and worldwide, and associated with Plaintiffs.

16.  Plaintiffs' products are among the most popular and well known products in their industry, and their line of products is famous throughout the country and the world.

17.  The appearance of Plaintiffs' products, packaging and trademarks are distinctive symbols which serve as trademarks of Luv n' care's products in interstate commerce, both in the United States and worldwide.

18.  The appearance of Plaintiffs' products, their associated packaging, and the trademarks thereon, have acquired secondary meaning, and are recognized as identifying Plaintiffs' high-quality products and services.

19.  Plaintiffs' products, packaging, trademarks, and their associated goodwill, are all valuable assets of Plaintiffs.

## DEFENDANTS' ILLEGAL ACTIVITIES

20.  Defendants are corporations which operate retail stores throughout the United States.

21.  In the past, Defendants have regularly bought products from Plaintiff Luv n' care.

22.  Recently, however, Defendants have turned to Royal King Baby Product Co. Ltd. ("RK") to secure cheap knockoffs of Plaintiffs' products.

23.  RK is a Thailand company which engages in regular and repeated copying and piracy of intellectual property.

-4-

24.  RK has taken the products, packaging, and trademarks of Plaintiffs, and copied and imitated them without authorization.

25.  Defendants have then offered for sale, sold, and distributed those false, unauthorized, copies throughout the United States.

26.  The defendant retailers have deliberately decided to sell product designs and packaging that confusingly imitate the appearance of the products and packaging of Luv n'care.

27.  Defendants are using those illegal copies to replace Plaintiffs' products previously sold in Defendants' retail stores.

28.  Defendants' bad faith activities have caused deception in the marketplace, and extensive damage to Plaintiffs, their business and their reputation.

## DEFENDANTS' INFRINGEMENT
## OF PLAINTIFFS' PRODUCT DESIGNS AND PACKAGING

29.  Illustrations of Defendants' unlawful products are attached as Exhibits A-E hereto.  The original Luv n' care products are shown on the right and the deceptive copies sold by Defendants are shown on the left.

## Copying of Luv n' care "Sports Sipper"

30.  Attached as Exhibit A is an image of a Luv n' care product next to an image of the RK copy thereof.

31.  This is an original LNC no-spill drinking cup product and packaging known as the Luv n' care "Sports Sipper".

32.  As shown therein, RK has copied the appearance of Luv n' care's product.

33.  RK has also copied the appearance of Luv n' care's packaging.

-5-

34.   RK has also copied the configuration of circular iconic symbols ("icons") around the rim of the packaging on Luv n' care's product.

35.   The icons are circular symbols developed by Plaintiffs to serve as trademarks of Luv n' care's products in interstate commerce, and form a distinctive configuration around the rim of Luv n' care's cup.

36.   As shown in the exhibit, RK's product and package are meant to deceptively imitate Luv n' care's product and package and to confuse the public.

37.   Kmart previously sold the original Luv n' care product.

38.   Kmart has discontinued the Luv n' care product, and has replaced it with the cheaper RK copy.

### Copying of Luv n' care "Gripper Cup"

39.   As a further example, attached as Exhibit B is an image of another Luv n' care product, next to an image of the RK copy thereof.

40.   This is an original no-spill drinking product of Luv n' care known as its "Gripper Cup".

41.   As shown in the exhibit, RK has deceptively imitated this Luv n' care's product as well.

42.   Kmart and Walgreen previously sold the original Luv n' care product.

43.   Kmart and Walgreen have discontinued the original Luv n' care product, and have replaced it with the cheaper RK copy.

### Copying of Luv n' care No-Spill Cup

44.   As yet a further example, attached as Exhibit C is an image of another Luv n' care product, next to an image of RK's copy thereof.

45.   This is a further no-spill drinking product of Luv n' care.

-6-

46.   As shown in the exhibit, RK has deceptively imitated this Luv n' care product as well.

47.   Walgreen previously sold the original Luv n' care product.

48.   Walgreen has discontinued the original Luv n' care product, and has replaced it with the cheaper RK copy.

## Copying of Luv n' care "Flip-It Sports Sipper"

49.   As yet a further example, attached as Exhibit D is an image of another Luv n' care product, next to an image of RK's copy thereof.

50.   This is another original Luv n' care's product, known as its "Flip-It" sports sipper.

51.   As shown in the exhibit, RK has deceptively imitated this Luv n' care's product as well.

52.   Kmart is selling the RK copy in its retail stores.

## Copying of Luv n' care Comb and Brush Set

53.   As yet a further example, attached as Exhibit E is image of a further Luv n' care product, next to an image of RK's copy thereof.

54.   This is another original Luv n' care product, which is a design for a comb and brush set.

55.   As shown therein, RK has deceptively imitated this Luv n' care product as well.

56.   Kmart has discontinued the original Luv n' care product, and has replaced it with the cheaper RK copy.

## Copying of Luv n' care's Line of Products

57.   As shown, for example, by Exhibits A-E, Luv n' care's products have been systematically copied by RK.  RK's products, packaging, and trademarks have been repeatedly designed to resemble those of Plaintiffs, to cause confusion, mistake, and deception in the marketplace.

-7-

58.     The individual appearance of RK's products sold by Defendants are designed to imitate the appearance of Plaintiffs' products.

59.     The collective appearance of RK's products sold by Defendants are also designed to imitate the appearance of Plaintiffs' line.

60.     Furthermore, the replacement of Plaintiffs' products with illegal copies in the same locations as the original products were previously found, further causes and creates consumer confusion.

61.     Both the copying of Plaintiffs' individual products and packaging, and the copying of the overall appearance of Plaintiffs' line of products, has been calculated to illegally trade off of Plaintiffs' reputation and good will.

### Confusion, Dilution, and Tarnishment

62.     The RK products in Exhibits A-E are not authorized by Plaintiffs.

63.     Defendants are profiting off those unauthorized products.

64.     The trade and purchasing public are likely to be misled into believing that the unauthorized copies shown in Exhibits A-E originate with or are otherwise authorized by, sponsored by, licensed by, or associated with Plaintiffs.

65.     Defendants are using Plaintiffs' product designs and packaging to trade off of Plaintiffs' reputation and goodwill and to create deception in the marketplace.

66.     Defendants' are also diluting and tarnishing the distinctive quality of Plaintiffs' famous product designs, packaging and marks.

## Safety Issues with RK's Illegal copies

67.     Defendants' actions also damage Plaintiffs' reputation.

68.     Recently, for example, ABC News displayed tests of RK's products on national television as part of an investigation on the safety of children's products.  A copy of an article from ABC News referring to the investigation is annexed as Exhibit G hereto.

69.     In its investigation, ABC News had RK's sports sipper products analyzed by an independent outside laboratory.  Those tests indicated that RK's sports sipper products have <u>lead</u> in them.

70.     Those lead-containing products are provided for use by <u>babies</u>.

71.     Those lead-containing products are highly similar in appearance and packaging to Luv n' care's products.  In fact, they are copies of Plaintiffs' products and packaging, as shown in Exhibit A.

72.     The public is highly concerned and alarmed by the presence of lead in products provided for babies.

73.     Serious safety issues regarding RK's illegal copies have caused, and are likely to further cause, the public alarm over Plaintiffs' products, due to confusion between the original products and the lead-containing copies.

74.     The similarity between RK's confusingly similar copies and Plaintiffs' original products, has caused, is causing, and is likely to further cause, irreparable damage to Plaintiffs' business and reputation.

## <u>WILLFUL INFRINGEMENT</u>

75.    Defendants' activities have been deliberate and willful.

76.    Defendants are familiar with Plaintiffs' original products, and have deliberately chosen to sell the unauthorized products from the RK manufacturer in Thailand.

77.    Defendants have replaced the original Luv n' care products that were previously in its stores with the RK copies.

78.    Defendants were expressly placed on notice and verbally warned by Plaintiff Luv n' care to avoid copied products from the RK intellectual property pirate, but chose to disregard Plaintiffs' warnings and to engage in their illegal activities nonetheless.

79.    In addition, Defendant Walgreen was also notified in writing.  A copy of Plaintiff Luv n' care's notice letter to Defendant Walgreen is attached as Exhibit F hereto.

80.    Defendants' actions have caused and are causing irreparable damage to Plaintiffs, their business, and their reputation.

81.    Plaintiffs have been extensively damaged by Defendants' bad faith activities and will continue to be so damaged unless Defendants is restrained and restrained and enjoined by this Court.

## FIRST CAUSE OF ACTION:
## <u>FEDERAL UNFAIR COMPETITION AND TRADEMARK INFRINGEMENT IN VIOLATION OF SECTION 43(A) OF THE LANHAM ACT</u>

82.    Plaintiff Luv n' care repeats and reallege each and every allegation contained in paragraphs 1 through 81 as if fully set forth herein.

83.    Defendants are intentionally using Plaintiffs' product designs and packaging to trade off of Plaintiffs' reputation and goodwill and to create deception in the marketplace.

-10-

84.  Defendants' activities, in selling and offering for sale merchandise which confusingly imitates and copies Plaintiffs' product designs, constitutes unfair competition, false designation of origin, and false description and representations, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

85.  Plaintiffs have no adequate remedy at law.  As a result of the aforesaid acts of Defendants, Plaintiffs are suffering irreparable harm, and will continue to do so, unless Defendants are restrained and enjoined by this Court from continuing to commit the aforesaid acts.

86.  Defendants' acts of infringement were and are willful and deliberate.  They have knowingly replaced Plaintiffs' original products with unauthorized copies from the RK manufacturer in Thailand.

87.  Defendants have profited from their infringing activities.

88.  Plaintiffs have suffered, and continue to suffer, substantial damages as a result of Defendants' bad faith activities, in an amount to be determined by this Court.

## SECOND CAUSE OF ACTION:
## FEDERAL TRADEMARK DILUTION

89.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 88 as if fully set forth herein.

90.  The appearance of Plaintiffs' products and packaging, and the symbols thereon, are famous trademarks of Plaintiffs.

91.  Those marks qualify as famous trademarks under the meaning of the Federal Trademark Dilution Act of 1995, Section 43(c) of the Lanham Act, 15 U.S.C. §1125(c).

92.     Defendants' actions in using Plaintiffs' famous marks in commerce are causing, and continue to cause, actual dilution of the distinctive quality of Plaintiffs' mark, including blurring and tarnishment of Plaintiffs' mark.

93.     Defendants have willfully intended to trade on Plaintiffs' reputation and to cause dilution of Plaintiffs' mark.

94.     By reason of the foregoing, Plaintiff has been injured in an amount to be determined by this Court, and is entitled to the remedies provided for in the Lanham Act, 15 U.S.C. § 1114, et seq.

### THIRD CAUSE OF ACTION:
### UNFAIR COMPETITION UNDER NEW YORK LAW

95.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 94 as if fully set forth herein.

96.     Plaintiffs have created their products, packaging, and marks through extensive time, labor, skill and money.

97.     Defendants have misappropriated the results of that labor and skill and those expenditures of Plaintiffs.

98.     They have used Plaintiffs' products, packaging and marks in competition with Plaintiffs, gaining a unfair advantage, because Defendants and their manufacturer bore little or no burden of expense of development.

99.     By taking deceptive copies of Plaintiffs' products and then using to compete against Plaintiffs' own products, Defendants have misappropriated a commercial advantage belonging to Plaintiffs.

100.   Defendants have also engaged in bad faith misappropriation of the labors of Plaintiffs which is likely to cause confusion, and to deceive purchasers as to the origin of the goods, and which dilutes the value of Plaintiffs' product designs and packaging.

101.   Defendants' actions have caused significant commercial damage to Plaintiff.

102.   Defendants' decision to distribute the illegal products from Thailand is also irresponsible and potentially dangerous to the public and young children.

103.   Defendants' business conduct is illegal and actionable under the common law of unfair competition of the State of New York.

104.   Plaintiff has been injured by Defendants' illegal actions and is entitled to the remedies provided under New York law.

**FOURTH CAUSE OF ACTION:**
**VIOLATION OF NEW YORK**
**GENERAL BUSINESS LAW SECTION 349**

105.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 104 as if fully set forth herein.

106.   Defendants' acts are consumer oriented, are misleading in a material way, and Plaintiffs have suffered injury as a result of Defendants' deceptive practices.

107.   By pursuing their misleading activities, Defendants have engaged in deceptive acts and practices in violation of New York General Business Law §349.

108.   By reason of the foregoing, Plaintiffs have been injured by Defendants' illegal actions and is entitled to the remedies provided for in the New York General Business Law.

-13-

### FIFTH CAUSE OF ACTION:
### VIOLATION OF NEW YORK
### <u>GENERAL BUSINESS LAW SECTION 360-1</u>

109.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through

108 as if fully set forth herein.

110.    Defendants' misappropriation and infringement creates a likelihood of injury to Plaintiffs'

business reputation and dilution of the distinctive quality of Plaintiffs' products and

packaging in violation of Section 360-1 of the New York General Business Law.

111.    Defendants' activities have also created actual injury to Plaintiffs' business reputation and

actual dilution of the distinctive quality of Plaintiffs' products and packaging.

112.    By reason of the foregoing, Plaintiffs have been injured by Defendants' illegal actions and

are entitled to the remedies provided for in the New York General Business Law.

### <u>DAMAGES</u>

113.    Plaintiffs have been extensively damaged by Defendants' illegal actions in an amount to be

determined by this Court, including lost sales, lost profits and damage to its reputation and

good will.

114.    Plaintiffs request that this honorable Court assess enhanced and punitive damages against

Defendants in the fullest amount permissible by law, in view of the egregious, malicious, and

extensive nature of Defendants' bad faith activities complained of herein, and in view of the

repeated number of violations, the willful nature of the violations, and the significant damage

to Plaintiffs, as set forth above.

## JURY TRIAL DEMAND

115.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure and all applicable law, Plaintiff

requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests a judgment of this Court:

(a)     That Defendants have engaged in federal unfair competition, trademark infringement,

trademark dilution, and misrepresentation under Section 43 of the Lanham Act, 15 U.S.C.

§1125; and engaged in unfair competition, dilution, and deceptive and unfair business

practices, in violation of the common law and the law of the State of New York;

(b)     That Defendants, their officers, agents, servants, employees, representatives, distributors and

all persons in concert or participation with Defendants be preliminarily and permanently

enjoined from engaging in any activities which infringe Plaintiffs' rights in its products,

packaging, and trademarks;

(c)     That Defendants, their officers, agents, servants, employees, representatives, distributors, and

all persons in concert or participation with them be preliminarily and permanently enjoined

from making, using, importing, offering for sale and selling any products or packaging which

infringe Plaintiffs' rights;

(d)     That Defendants, their officers, agents, servants, employees, representatives, distributors, and

all persons in concert or participation with them be preliminarily and permanently enjoined

from selling or marketing merchandise in any way that tends to deceive, mislead or confuse

-15-

the public into believing that Defendants' merchandise in any way originates with, is sanctioned by, or affiliated with Plaintiffs;

(e)     That Defendants, their officers, agents, servants, employees, representatives, distributors, and all persons in concert or participation with them be preliminarily and permanently enjoined from otherwise competing unfairly with Plaintiffs;

(f)     That Defendants, their officers, agents, servants, employees, representatives, distributors, and all persons in concert or participation with them be preliminarily and permanently enjoined from diluting the distinctive qualities of Plaintiffs' products;

(g)     That Defendants, their officers, agents, servants, employees, representatives, distributors, and all persons in concert or participation with them be preliminarily and permanently enjoined from engaging in any further deceptive or unfair business practice with respect to Plaintiffs, under federal law or under the statutory and common law of the State of New York;

(h)     That Defendants be directed to file with this Court and serve on Plaintiffs within thirty (30) days after service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which the Defendants have complied with the injunction;

(i)     That Defendants be required to account for and pay over to Plaintiffs any and all profits derived by them and all damages sustained by Plaintiffs by reason of the acts complained of in this Complaint, including an assessment of interest on the damages so computed, and that the damages be trebled pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117, and all applicable law;

(j)     That Defendants be required to account for and pay over to Plaintiffs such actual damages as Plaintiffs have sustained as a consequence of Defendants' infringement of Plaintiffs'

-16-

trademarks and trade dress, and to account for and pay to Plaintiffs all of Defendants' gains, profits and advantages attributable to or derived by Defendants' infringement of Plaintiffs' federal, state and common law rights;

(k)    That Defendants be required to account for and pay over to Plaintiffs such damages as the Court deems proper under the statutory and common law of the State of New York;

(l)    That each such award of damages be enhanced to the maximum available for each infringement in view of Defendants' willful infringement of Plaintiffs' rights;

(m)    That Defendants be required to deliver up for impoundment during the pendency of this action, and for destruction thereafter, all copies of the infringing materials in its possession or under its control and all materials, including any molds and master models used for making same;

(n)    That Plaintiffs be awarded punitive damages because of the egregious, malicious, and tortious conduct of Defendants complained of herein;

(o)    That Plaintiffs recover the costs of this action including its expenses and reasonable attorney's fees pursuant to 15 U.S.C. §1117 and all further applicable law, because of the deliberate and willful nature of the infringing activities of Defendants sought to be enjoined hereby, which make this an exceptional case warranting such award;

(p)    That Plaintiffs obtain all further relief permitted under the laws of the United States and the State of New York; and,

(q)    That Plaintiffs obtain all such other and further relief as the Court may deem just and equitable.

-17-

Dated: May 12, 2008                     Respectfully submitted,

                                        S/
                                        _____
                                        Morris E. Cohen (MC-4620)
                                        Rochelle R. Weisburg (RW-6848)
                                        Law Office of Morris E. Cohen, P.C.
                                        One Penn Plaza, Suite 2527
                                        New York, New York 10119
                                        212-244-4111 x226 (phone)
                                        212-563-7108 (fax)
                                        mcohen@ipcases.com (email)

                                        Attorneys for Plaintiffs


                                        Of Counsel:
                                        Joe D. Guerriero (Bar No. 06391)
                                        Luv n' care, Ltd.
                                        3030 Aurora Avenue
                                        Monroe, Louisiana 71201
                                        318-338-3603 (phone)
                                        318-388-5892 (fax)



**EXHIBIT A**



**EXHIBIT B**



**EXHIBIT C**



**EXHIBIT D**



**EXHIBIT E**

Law Office of Morris E. Cohen, P.C.
_____

1122 Coney Island Avenue, Suites 216-217 • Brooklyn, New York 11230 • 718-859-8009 (phone) • 718-859-3044 (fax)

July 18, 2006

Via Facsimile (847) 914-2849 (2 pages total)
and DHL Express Mail (Airbill No. 832 7079 051)

Jeff Kruckman
Walgreens Company
200 Wilmot Road
Deerfield, IL 60015

> Re:   Luv n' care No-Spill Cup Intellectual Property/Walgreens
> Our File No.: 4009.123

Dear Mr. Kruckman:

We are intellectual property counsel to Luv n' care, Ltd.  I am writing to you with respect to Luv n' care products that have been carried by your company in the past.

Please be advised that various no-spill drinking products sold by Luv n' care are covered by one or more issued patents, including, for example, U.S. Patent Nos. 6,321,931 B1, 6,357,620 B1, and/or 6,994,225 B2, with additional domestic and foreign patents issued and/or pending.  In addition to patent rights, those products are also subject to other forms of intellectual property protection, such as trademark, trade dress, unfair competition, and copyright.

I am hereby placing you and your company on express notice of those rights, and strongly advise you to bring them to your legal department's attention.

In particular, you are aware of Luv n' care's No-Spill Gripper Cup, which you have carried in your stores for some time now.  As you know, this innovative product has achieved considerable success at Walgreens.  It has likewise met with enormous recognition and acclaim both domestically and worldwide.

I have been informed that your company intends to drop Luv n' care's Gripper Cups, so as to carry cheap copies of them from Thailand in their stead.  It is also my understanding that you have refused to provide Luv n' care with the identity of your intended supplier.

Accordingly, I must bring to your attention that there are numerous unreputable companies operating overseas who attempt to profit by copying or counterfeiting the innovative products of American companies, rather than by developing their own original designs.  If you choose to buy products from any such company you do so at your own peril.

LAW OFFICE OF MORRIS E. COHEN, P.C.

Letter of July 18, 2006 to Walgreens
Page 2 of 2

Unfortunately, you recently informed Luv n'care's representative that your company has decided to sell copies of Luv n' care's products regardless of whether or not they infringe Luv n'care's intellectual property rights.

It is also my understanding that you have expressed to Luv n' care a lack of concern about its rights due to an alleged indemnity agreement by your Thailand supplier, believing that such an agreement will protect you against a case of actual infringement.  It will not.

In the event that you choose to engage in a future infringement of Luv n' care's rights,  or to act with reckless disregard of Luv n'care's rights, please be advised that all sales of infringing product after this express notice was provided to you will constitute willful infringement under U.S. law.  Such willfulness potentially subjects your company to the payment of our client's attorneys' fees, and treble damages (based on such measures as Luv n' care's lost profits), in addition to other remedies such as a court-ordered injunction.

It is my understanding that you have not sold, offered for sale or imported any unauthorized products to date; accordingly, I am not accusing you of infringement at the present time.  I am, however, expressly cautioning you against taking any action in the future which would constitute intellectual property infringement in violation of law.

In conclusion, to the extent that you or your company chooses to disregard this cordial warning, you do so accepting the full potential consequences of your actions.

Sincerely yours,

Morris E. Cohen

cc:     Jack Hakim, President, Luv n' care
        Joe D. Guerriero, in-house counsel
        Ed Hakim, CEO, Luv n' care



# ABC Tests 100 Children's Products and Finds 10 With Lead

**Government Tests Can Miss or Understate Lead Content**

**Nov. 1, 2007 —**

As children across the country begin to compile their holiday toy lists, their parents are facing a major predicament. At at time when millions of toys have been recalled due to lead contamination, just how safe are the current selection of toys?

In a quest for answers, ABC News bought 100 popular children's products from 10 different stores and tested them for lead. The verdict? Good news, and some not very good news.

We'll start with the good. Out of the 100 toys tested, 90 were lead-free, certain to be a comfort to parents.

But 10 of the items tested did contain lead. Plus, the investigation found the Consumer Product Safety Commission's own test methods may be missing or understating lead in children's products.

ABC consulted a licensed lead risk assessor who used a Niton X-ray device made by Thermo Fisher Scientific to quickly screen all 100 children's products for lead. The products with the highest lead levels were then submitted to another laboratory to verify the results.

First, ABC found lead in a set of lotions and potions for girls made by Tween brands -- a pearl on the packaging contained lead. Getting an exact reading on such a tiny painted specimen is difficult. Lab tests found 500 parts per million, but the Niton X-ray device detected 2,000 parts per million. Lead paint over 600 parts per million is illegal.

Next up was a sport sipper bottle. Babies are meant to drink from it, yet we found it contained 300 parts per million of lead. The Food and Drug Administration has jurisdiction here and said it could take action if lead in a food-contact product can contaminate food.

"It's more than I want to see," said Bill Radosevich of Thermo Fisher Scientific.

A plastic duck, purchased at Cost Plus World Market, contained 800 parts per million of lead. Another plastic culprit: a saddle -- part of a Kmart set -- contained 1,600 parts per million.

Like the bottle and the duck, the lead was embedded in the plastic rather than in surface paint. But believe it or not, there is no set legal limit for lead in plastic toys.

Radosevich would like to see an outright ban. "Absolutely," he said. "There's no reason for lead to be in a lot of products so it shouldn't be there."

Some manufacturers argue that the total lead content of a product is not important. They say what matters is whether that lead is accessible to children.

In the past, the Consumer Product Safety Commission has argued that lead can't leach out of plastics, but that has recently changed. The agency issued its first recall due to lead found in a plastic toy, citing "a risk of lead exposure to young children." The commission declined to comments about ABC's lead findings.

"The CPSC has a battery of tests that we've used for a number of years," said Nancy Nord, acting chair of the commission. "They are viewed as the scientific level of excellence for dealing with this particular problem. So, without having our own set of tests, I really can't respond to yours."

So is the Consumer Product Safety Commission's battery of tests top notch? ABC hired yet another lab that uses the commission's methods.

Those tests didn't detect lead in the bottle, the duck or the saddle -- levels that two other techniques consistently identified.

Sandy Roda, who studied lead hazards for 34 years at the University of Cincinnati, wasn't surprised.

"The analytical methods that are being recommended by the CPSC today are not sufficient or adequate methods 100 percent of the time, not even 50 percent of the time to give us an accurate total led assessment of a child's item," said Roda, analytical laboratory director for the university.

The commission's lab method is most often used to analyze children's jewelry. It detected 800 parts per million of lead in a pendant from Claire's Boutiques, but the laboratory method we used -- one developed by another federal agency -- found 900 parts per million.

The findings raises the question: Could the commission be missing lead in other children's products that ought to be recalled?

Regarding the pearl on the Tween brand's lotions set, Tween said it removed the packaging in question as soon as the results were brought to the company's attention and then reported the pearl to the commission, which lead to a formal recall Wednesday.

Cost Plus World Market said it conducted its own tests on the ducks and also found lead in them, but the manufacturer believes that lead is trapped in the plastic. Nevertheless, World Market said it destroyed its remaining ducks and is offering concerned consumers a refund.

The bottle and saddle are both sold exclusively at Kmart. Kmart said both products passed the company's own internal tests and meet federal standards. Kmart said because of the rash of recalls of Chinese-made products, it has started doing random testing of its private label toys sold here in the United States.

Claire's Boutiques said the necklace we tested is meant for teenagers and young women rather than children and that the product passed its own lab tests.

So what did the Consumer Product Safety Commission have to say about ABC's tests of the commission's own methods?

Julie Vallese, a spokeswoman for the commission, said its lead-testing protocols "are sound and often used by U.S. companies to test the safety of children's products." She added that the commission's attention to the issue has led to 19 toy recalls so far this year.

The agency also recently purchased several X-ray devices after a member of Congress questioned why it wasn't using such devices.

Copyright © 2007 ABC News Internet Ventures